IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| NETTIE CHAMBERS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO.  3:14-CV-237-WKW |
| | ) | [WO] |
| GROOME TRANSPORTATION OF | ) | |
| ALABAMA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

## I.  INTRODUCTION

Forty-five Plaintiffs bring this complaint against their former employer, alleging violations of the Workers' Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101–09 ("WARN Act") and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201–19.  In lieu of an answer, Defendant Groome Transportation of Alabama, Inc. ("Groome Transportation") filed a motion to compel arbitration. (Doc. # 8.)  Groome Transportation argues that an arbitration agreement and the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16 require Plaintiffs to submit their claims to binding arbitration rather than file suit.  Plaintiffs oppose the motion.  After careful consideration of the arguments of counsel, the relevant law, and the evidence, the court finds that, as to all but one Plaintiff, there exists a genuine dispute with respect to the "making" of an arbitration agreement.  As to

those forty-four Plaintiffs, this action will proceed to a bench trial pursuant to 9 U.S.C. § 4 regarding the making of agreements to arbitrate.  As to Plaintiff Annie L. Adams, Groome Transportation's motion to compel arbitration is due to be granted.

## II.  JURISDICTION AND VENUE

Subject-matter jurisdiction is proper pursuant to 28 U.S.C. § 1331.  Personal jurisdiction and venue are uncontested.

## III.  BACKGROUND

The forty-five Plaintiffs are former employees of Groome Transportation, which had contracted with Auburn University to provide shuttle bus services for its students.  Plaintiffs worked as shuttle bus drivers, transporting students within Auburn's city limits and principally on Auburn University's campus, beginning prior to April 2012 and continuing until July 2013 when Groome Transportation closed its area plant.  (Compl. ¶ 16.)

Until April 2012, Groome Transportation paid Plaintiffs at a rate of time-and-a-half for all hours worked over forty per week.  However, in April 2012, Groome Transportation ceased paying its shuttle bus drivers overtime wages, even though the drivers continued to perform the same duties and work the same shifts with overtime hours.  Plaintiffs allege that, at this time, Groome Transportation created a bogus shuttle service to the Atlanta, Georgia airport in an attempt to

2

"create a loophole in the [FLSA] overtime laws" presumably under the motor-carrier exemption, *see* 29 U.S.C. § 213(b)(1).[1]   In October 2012, Groome Transportation drivers "staged a walk-out."  (Pl. Cassandra Young Aff., at 2 (Doc. # 18-1).)  As a result of the walk-out and concomitant pressure from Auburn University, Groome Transportation recommenced paying overtime wages in December 2012.

Additionally, in October 2012, around the time of the walk-out, Groome Transportation presented its employees with a one-page Arbitration Agreement, which was added to the Personnel Policy Handbook.  The Arbitration Clause and Agreement provides:

> The parties agree that any dispute, controversy or claim arising out of or related to Employee's employment with Groome Transportation of Alabama, shall be submitted to and decided by binding arbitration in Richmond, Virginia.  Arbitration shall be administered and conducted under the Mediation Rules by mediators of the American Arbitration Association ("AAA").  The rules are available online at www.adr.org. You may also call the AAA at 1-800-778-7879 if there are any questions about the arbitration process.  Discovery in any arbitration proceeding shall be conducted according to the American Arbitration Association Rules.

(Arbitration Agreement (Ex. A to Doc. # 8).)  The Arbitration Agreement also contains an acknowledgement with signature lines for the employee and a Groome Transportation official to sign.  The acknowledgment provides:

---

[1] This alleged "loop-hole run," as Plaintiffs call it, is set out in detail in the Complaint. (*See* Compl. ¶¶ 20–32.)

3

> This agreement to arbitrate is freely negotiated between Employee and Groome Transportation of Alabama, and is mutually entered into between the parties. Each party fully understands and agrees that they are giving up certain rights otherwise afforded to them by civil court actions, including but not limited to a jury trial.

(Arbitration Agreement.)

The record does not reveal how many Plaintiffs signed the acknowledgement. Groome Transportation submits only one signed Arbitration Agreement, and that agreement bears the signature of Plaintiff Annie L. Adams, dated January 23, 2013. (Pl. Adams's Arbitration Agreement (Ex. A to Doc. # 8).) Plaintiffs, in turn, submit one affidavit from Plaintiff Cassandra Young, who says that she "refused to sign the arbitration agreement." (Young's Aff., at 2.) While Ms. Young further attests that "many [other] employees" also refused to sign, she does not identify which Plaintiffs, if any, are in the group of employees who did not sign an Arbitration Agreement. (Young's Aff., at 2.) On this record then, the facts known are that one Arbitration Agreement bears the signature of Annie L. Adams (who has not disputed the authenticity of the signature) and that one Plaintiff has refused to sign the agreement. The status of whether the remaining forty-three Plaintiffs signed or did not sign an Arbitration Agreement is unknown.

Groome Transportation's Regional Director, Kristie Holcombe, also attests that, "[a]s a condition of employment and/or continued employment, the Personnel Policy Handbook has contained a mutually binding arbitration agreement since

4

October 19, 2012." (Holcombe's Aff., at ¶ 4 (Ex. 1 to Doc. # 8).) Groome Transportation has not submitted an excerpt from the Personnel Policy Handbook that contains a written provision indicating that continued employment equates acceptance of the Arbitration Agreement. (Holcombe's Aff., at ¶ 4.) It is unclear from Ms. Holcombe's affidavit how Groome Transportation notified its employees of this condition of employment. Ms. Young attests, though, that Groome Transportation officials orally informed her, that if she did not sign the Arbitration Agreement, her employment would be terminated. But she also says that, when she refused to sign the agreement, she was not fired. Ms. Young also attests that she is "not aware of any co-workers who were terminated for refusing to sign the arbitration agreement." (Young's Aff., at 2.)

Ms. Young, along with her co-Plaintiffs, continued to work for Groome Transportation until July 2013, when Groome Transportation closed its Lee County facility. At that time, Plaintiffs' employment ended.

On April 2, 2014, Plaintiffs filed this action against Groome Transportation and three of its corporate officers. The Complaint contains two counts. In Count One, which alleges violations of the FLSA, Plaintiffs contend that from approximately April 1, 2012, to November 30, 2012, Groome Transportation did not adequately compensate them for hours worked in excess of forty hours per week. *See* 29 U.S.C. § 207(a)(1) (requiring that employees who work in excess of

5

forty hours per week be compensated "at a rate not less than one and one-half times the regular rate at which he is employed"). Plaintiffs seek unpaid overtime wages in a collective action under the FLSA. In Count Two, Plaintiffs bring a claim under the WARN Act, individually and as representatives of a proposed class, alleging that Groome Transportation failed to give the minimum sixty-day written notice to its employees as required by the WARN Act. Plaintiffs seek all relief available under the WARN Act, including sixty days back pay. Plaintiffs further demand a jury trial as to Count One. But Groome Transportation contends that court litigation of Plaintiffs' claims is not an option and that Plaintiffs must submit their claims to arbitration.

## IV.  STANDARD OF REVIEW

Pursuant to the FAA, a written arbitration provision in a "contract evidencing a transaction involving commerce" is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. If a party is "aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement," it may petition a federal district court "for an order directing that such arbitration proceed in the manner provided for in [the] agreement." 9 U.S.C. § 4. When addressing a § 4 motion, the district court must determine whether there is a binding agreement to arbitrate and, if so, whether the nonmovant has breached its obligation to

arbitrate under that agreement.  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 22 n.27 (1983) (citing 9 U.S.C. §§ 4, 6).

The court can consider evidence outside of the pleadings for purposes of a motion to compel arbitration.  The Eleventh Circuit has countenanced the use of the summary judgment standard to resolve a motion to compel arbitration.  *See Johnson v. Keybank Nat'l Assoc.*, 754 F.3d 1290, 1294 (11th Cir. 2014) (describing an order compelling arbitration as "summary-judgment-like"; it is "'in effect a summary disposition of the issue of whether or not there has been a meeting of the minds on the agreement to arbitrate'") (quoting *Magnolia Capital Advisors, Inc. v. Bear Stearns & Co.*, 272 F. App'x 782, 785–86 (11th Cir. 2008) (per curiam)).

The FAA evinces a "liberal federal policy favoring arbitration agreements." *Hill v. Rent-A-Center, Inc.*, 398 F.3d 1286, 1288 (11th Cir. 2005) (quoting *Moses*, 460 U.S. at 24); *see also Picard v. Credit Solutions, Inc.*, 564 F.3d 1249, 1253 (11th Cir. 2009) ("The FAA creates a strong federal policy in favor of arbitration.").  "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone*, 460 U.S. at 24–25.  Accordingly, courts "rigorously enforce" arbitration agreements.  *Klay v. All Defendants*, 389 F.3d 1191, 1200 (11th Cir. 2004).  The FAA provides that "upon any issue referable to arbitration under an agreement in writing for such arbitration," and

"upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement," the court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3.

## V. DISCUSSION

The motion to compel arbitration, as briefed by the parties, raises four issues: (1) whether the Arbitration Agreement is a written agreement involving interstate commerce as required by 9 U.S.C. § 2; (2) whether the Arbitration Agreement is unenforceable for lack of mutual assent or because it is unconscionable; (3) whether the scope of the Arbitration Agreement, assuming that it is binding, covers federal statutory claims or claims predicated on conduct that preexists the making of the Arbitration Agreement; and (4) whether the parties agreed that the arbitrator would decide the first four issues.

Issues one, two, and three are relevant to whether the "making of the agreement for arbitration" is "in issue" such that a trial is necessary under 9 U.S.C. § 4. These issues are presumptively for the court to decide, unless there is an "agreement to the contrary between the contracting parties." *Grigsby & Assocs., Inc. v. M Sec. Inv.*, 664 F.3d 1350, 1352 (11th Cir. 2011) (explaining that the Supreme Court has "noted two questions that are presumptively for the courts: 'whether the parties are bound by a given arbitration clause' and 'whether an

8

arbitration clause in a concededly binding contract applies to a particular type of controversy.'" (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002)).  These issues will be referred to as issues of arbitrability.  *See Howsam*, 537 U.S. at 83 ("The question whether the parties have submitted a particular dispute to arbitration, *i.e.*, the question of arbitrability, is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise." (quotation marks, alterations, and citation omitted)).  The fourth issue focuses on which forum – judicial or arbitral – is the appropriate forum for resolution of issues one, two, and three.  The fourth issue necessarily must be addressed first.  Because the fourth issue resolves in favor of a judicial determination of the issues of arbitrability, this opinion also addresses issues one, two, and three.

A.    **The Appropriate Forum – Judicial or Arbitral – for Deciding the Issue of Arbitrability**

A threshold issue raised by Groome Transportation is whether the court or the arbitrator should resolve Plaintiffs' arguments pertaining to the issues of arbitrability.  Groome Transportation contends that the parties "have agreed to abide by the provisions of the AAA [American Arbitration Association]" and that,

therefore, "the arbitrator has jurisdiction to decide whether the arbitration agreement applies."[2]  (Doc. # 21, at 12.)

In *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938 (1995), the Supreme Court addressed the standard for assessing "who – the court or the arbitrator – has the primary authority to decide whether a party has agreed to arbitrate."  *Id.* at 942.  The Court explained:

> When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally (though with a qualification we discuss below) should apply ordinary state-law principles that govern the formation of contracts.  The relevant state law here, for example, would require the court to see whether the parties objectively revealed an intent to submit the arbitrability issue to arbitration.  This Court, however, has (as we just said) added an important qualification, applicable when courts decide whether a party has agreed that arbitrators should decide arbitrability:  Courts should not assume that the parties agreed to arbitrate arbitrability unless there is "clea[r] and unmistakabl[e]" evidence that they did so.  In this manner the law treats silence or ambiguity about the question "who (primarily) should decide arbitrability" differently from the way it treats silence or ambiguity about the question "whether a particular merits-related dispute is arbitrable because it is within the scope of a valid arbitration agreement" – for in respect to this latter question the law reverses the presumption.

> But, this difference in treatment is understandable.  The latter question arises when the parties have a contract that provides for arbitration of some issues.  In such circumstances, the parties likely gave at least some thought to the scope of arbitration.  And, given the law's permissive policies in respect to arbitration, one can understand

---

[2]  Plaintiffs have not addressed this argument, which was raised in Groome Transportation's reply brief.  Although new arguments in a reply brief need not be considered, Groome Transportation's new argument does not necessitate a surreply and consideration of the argument is in the interest of judicial efficiency.

why the law would insist upon clarity before concluding that the
parties did not want to arbitrate a related matter.  On the other hand,
the former question – the "who (primarily) should decide
arbitrability" question – is rather arcane.  A party often might not
focus upon that question or upon the significance of having arbitrators
decide the scope of their own powers.  And, given the principle that a
party can be forced to arbitrate only those issues it specifically has
agreed to submit to arbitration, one can understand why courts might
hesitate to interpret silence or ambiguity on the "who should decide
arbitrability" point as giving the arbitrators that power, for doing so
might too often force unwilling parties to arbitrate a matter they
reasonably would have thought a judge, not an arbitrator, would
decide.

*Id.* at 944–45.

Parties may delegate, therefore, the authority to rule on gateway arbitrability

issues to the arbitrator without running afoul of the FAA or case law.  *See Johnson*,

754 F.3d at 1291 ("Arbitration-friendly federal law recognizes 'delegation clauses'

that direct an arbitrator to decide the validity of an arbitration agreement.").  And

"[c]ourts should enforce valid delegation provisions as long as there is 'clear and

unmistakable' evidence that that the parties manifested their intent to arbitrate a

gateway question."  *Given v. M&T Bank Corp.*, 674 F.3d 1252, 1255 (11th Cir.

2012) (quoting *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 69 n.1 (2010)).

As the Eleventh Circuit has explained, "this rule makes imminent sense, for in the

absence of 'clear and unmistakable evidence' that the parties intended the

arbitrator to rule on the validity of the arbitration itself, the arbitrator would lack

authority to invalidate the very contract from which he derives his authority to

11

begin with." *Terminix Int'l Co., LP v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327, 1331 (11th Cir. 2005).

Groome Transportation contends that *Terminix* controls and requires a finding that the arbitrability question itself is for the arbitrator.   The court disagrees.

In *Terminix*, the Eleventh Circuit held that the parties had agreed to arbitrate whether disputes were arbitrable based upon the agreement's incorporation of the AAA's Commercial Arbitration Rules.  Those rules gave the arbitrator the power "'to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement.'"   *Id.* (quoting AAA Commercial Arbitration Rule 8(a)).   The Eleventh Circuit held that, "[b]y incorporating the AAA Rules, including Rule 8, into their agreement, the parties clearly and unmistakably agreed that the arbitrator should decide whether the arbitration clause is valid."  *Id.*

The arbitration agreement in *Terminix* expressly incorporated the AAA's Commercial Arbitration Rules, and those rules in turn delegated issues of arbitrability to the arbitrator.  *Id.*  "The Eleventh Circuit and the majority of other Circuits . . . have held that . . . incorporation of arbitration rules that empower an arbitrator to decide the issue of arbitrability is sufficient" for an effective delegation.  *Supply Basket, Inc. v. Global Equip. Co.*, No. 13cv3220, 2014 WL

2515345, at *2 (N.D. Ga. June 4, 2014) (citing *Terminix*, 432 F.3d at 1332–33 (collecting cases)).   As the *Supply Basket* court recognized, "[T]oday, all of the AAA rules include a jurisdictional rule stating, '[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement.'"   2014 WL 2515345, at *3 (quoting the Labor Arbitration Rules (Including Expedited Labor Arbitration Rules), the Employment Arbitration Rules and Mediation Procedures, the Commercial Arbitration Rules and Mediation Procedures (Including Procedures for Large, Complex Commercial Disputes)).   The court concluded, therefore, that, "by agreeing to arbitration by the AAA – under any set of AAA rules in place at the time the Agreements were executed or today – the Plaintiffs agreed to arbitrate the issue of arbitrability."   *Id.*

Unlike in *Terminix*, Groome Transportation's Arbitration Agreement does not contain an express delegation that clearly and unmistakably demonstrates that the parties agreed that the arbitrator would decide issues of arbitrability.   The Arbitration Agreement does not contain a provision that a particular subset of the AAA's arbitration rules governs or even a generic reference to the AAA's arbitration rules.   Instead, in unclear draftsmanship, the agreement provides that "[a]rbitration shall be administered and conducted under the Mediation Rules by mediators of the American Arbitration Association ("AAA")."   (Doc. # 8, Ex. A.)

13

The principal point of ambiguity is that the Arbitration Agreement does not provide for the application of the AAA's *arbitration* rules at all, but rather its *mediation* rules, with governance by a *mediator*, not an *arbitrator*.   Groome Transportation has not cited any provision of the referenced "Mediation Rules" that delegates to the arbitrator the authority to decide his or her own jurisdiction and understandably so.   The court has visited www.adr.org (last visited on Aug. 26, 2014),[3] but was unable to find a set of rules titled "Mediation Rules."   Rather, the website reveals that there are various types of rules (*e.g.*, Commercial Arbitration Rules, Labor Arbitration Rules, Employment Arbitration Rules, Construction Industry Arbitration Rules), and that "[m]ediation procedures are included in all of [the AAA's] major arbitration procedures, either as an option or as a step prior to an arbitration hearing."   The Arbitration Agreement here is confusing because of its reference to "Mediation Rules" that do not independently exist on the AAA's website and that, quite simply, are not arbitration rules.[4]

Groome Transportation has not attempted to dispel the ambiguity that the reference creates as to whether the parties intended to delegate to the arbitrator the issue of arbitrability.   Nor has it even mentioned the ambiguity, which the court

---

[3] The Eleventh Circuit in *Terminix* also accessed www.adr.org because the rules were not included in the appeal record.  *See* 432 F.3d 1333 n.5.

[4] There is a fundamental, categorical difference between mediation and arbitration. Though mediation is usually more flexible and can even, by agreement of the parties, be binding, it is by no means the equivalent of arbitration.

14

finds telling.  On this record, *Terminix* does not control, and there is an absence of evidence that "the parties clearly and unmistakably agreed that the arbitrator should decide whether the arbitration clause is valid."   432 F.3d at 1332. Accordingly, all issues of arbitrability are for this court to decide.

**B.**     **Section 2's Requirements**

Section 2 of the FAA provides that

> [a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

Section 2 requires a two-pronged inquiry:   first, whether there is an arbitration agreement in writing; and second, if so, whether the agreement is part of a transaction involving interstate commerce.   Groome Transportation bears the burden of proving both prongs.  *Univ. of S. Ala. Found. v. Walley*, No. 99cv1287, 2001 WL 237309, at *3 (M.D. Ala. Jan. 30, 2001); *see also Williams v. Eddie Acardi Motor Co.*, No. 07cv782, 2008 WL 686222, at *7 (M.D. Fla. Mar. 10, 2008) ("Defendant's burden is to establish there is a valid written agreement to arbitrate.").  These prongs also are not resolved with the "thumb on the scale in favor of arbitration because the federal policy favoring arbitration does not apply to the determination of whether there is a valid agreement to arbitrate between the parties." *Bd. of Trs. of City of Delray Beach & Firefighters*, 622 F.3d 1335, 1342

(11th Cir. 2010) (citation and internal quotation marks omitted); *see also Volt Info. Sciences, Inc. v. Bd. of Trs.*, 489 U.S. 468, 478 (1989) ("[T]he FAA does not require parties to arbitrate when they have not agreed to do so.").

The existence of a written agreement that affects interstate commerce, at least as to forty-four Plaintiffs, is in dispute.  Under the summary-judgment-like procedure that applies to motions to compel arbitration, Groome Transportation initially must show that the Arbitration Agreement applies to Plaintiffs.  If Groome Transportation meets that burden (as to one or more Plaintiffs), then Plaintiffs can rebut that showing with evidence establishing a genuine dispute as to whether the Arbitration Agreement was formed.  And "[o]nly when there is no genuine issue of fact concerning the formation of the agreement should the court decide as a matter of law that the parties did or did not enter into such an agreement." *Magnolia Capital Advisors*,  272 F. App'x at 785–86.  "Further, as in the case of any other summary judgment, a district court considering the making of an agreement to arbitrate, should give to the [party denying the agreement] the benefit of all reasonable doubts and inferences that may arise." *Id*. at 786 (citation and internal quotation marks omitted).

### 1.    *Written Agreement*

Under the FAA, "parties cannot be forced to submit to arbitration if they have not agreed to do so." *Chastain v. Robinson-Humphrey Co.*, 957 F.2d 851,

854 (11th Cir. 1992).  Thus, "the first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute."  *Id.* (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985)).  "Under normal circumstances, an arbitration provision within a contract admittedly signed by the contractual parties is sufficient to require the district court to send any controversies to arbitration."  *Id.*  "Under such circumstances, the parties have at least presumptively agreed to arbitrate any disputes, including those disputes about the validity of the contract in general."  *Id.*

Plaintiffs emphasize that Groome Transportation has submitted only one arbitration agreement that actually was signed by a Plaintiff and contends that those Plaintiffs "who did not sign an arbitration agreement will proceed in this court."  (Doc. # 18, at 12.)  The gist of Plaintiffs' contention is that, as to forty-four of the forty-five Plaintiffs, Groome Transportation has not shown that there are written agreements to arbitrate.   Groome Transportation contends that the Arbitration Agreement itself is in writing, that each Plaintiff received a copy of it, and that the FAA does not contain an additional requirement that Plaintiffs must have signed the agreement.   Groome Transportation relies upon *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359 (11th Cir. 2005), but *Caley* turns out not to support its position.  Indeed, this case presents what no doubt is a rarity in the arbitration arena:  Groome Transportation, as the proponent of arbitration, has

failed to meet its burden, save one exception, of demonstrating that the parties actually agreed to arbitrate their disputes such that a trial is mandated. *See Magnolia Capital Advisors*, 272 F. App'x at 785 ("Once an agreement to arbitrate is . . . put 'in issue,' the Federal Arbitration Act (FAA) requires the district court to 'proceed summarily to the trial thereof' and if the objecting party has not requested a jury trial, 'the court shall hear and determine such issue.'" (quoting 9 U.S.C. § 4)).

In *Caley*, the plaintiffs – employees who had sued their employer for violations of federal anti-discrimination statutes, including the FLSA – argued that a dispute resolution policy that contained an arbitration provision was not an "agreement in writing," as required under § 2 of the FAA, because the employees had not signed the policy.  428 F.3d at 1368.  The Eleventh Circuit held that "no signature is needed to satisfy the FAA's written agreement requirement."  *Id.* at 1369 (referring to the FAA's requirements of "[a] written provision," "agreement in writing," and "written agreement" as the "'written agreement' requirement").   It explained that, while the FAA requires that an arbitration provision must be "written," there is no concomitant requirement that the "agreement to arbitrate be signed by either party." *Id.*

In *Caley*, the dispute resolution policy was "indisputably in writing." *Id.* The fact that the plaintiffs had not accepted its terms in writing did not preclude a

finding that there was a "written agreement" because the policy expressly provided that continuation of employment would constitute acceptance of the policy.  The Eleventh Circuit explained, "Although the employees' acceptance was by continuing their employment and was not in writing, all material terms – including the manner of acceptance – were set forth in the written [dispute resolution policy]."  *Id*.  The Eleventh Circuit concluded, therefore, "that the dispute resolution policy was "a written agreement to arbitrate for purposes of the FAA." *Id.* at 1370.

Here, as previously discussed, there is evidence that Plaintiff Annie L. Adams signed the agreement.  Ms. Adams has not contested the authenticity of the signature.  *See, e.g., Scone Invs., L.P. v. Am. Third Mkt. Corp.*, 992 F. Supp. 378, 381 (S.D.N.Y. 1998) (finding that the movants had "satisfied their initial burden of demonstrating a written agreement obligating both plaintiffs to arbitrate by producing a copy of the customer agreement which includes an arbitration clause and which was purportedly signed by [the other party]" (citation and internal quotation marks omitted)).  The burden shifts, therefore, to Ms. Adams to show that no valid contract existed and to meet that burden she must "unequivocally deny that an agreement to arbitrate was reached and must offer some evidence to substantiate the denial." *Magnolia Capital Advisors*, 272 F. App'x at 785 (citing *Chastain*, 957 F.2d at 854).  Ms. Adams has not denied the authenticity of her

signature or that she signed the Arbitration Agreement. Because there is no unequivocal and substantiated denial from Ms. Adams, Groome Transportation has demonstrated a written agreement between it and Ms. Adams for arbitration of her claims in this suit. This much does not appear to be in dispute.

What is in controversy is whether there is a written agreement as to the one Plaintiff who indisputedly did not execute the Arbitration Agreement (Cassandra Young) and as to the other forty-three Plaintiffs for whom there is *no* evidence of a signed agreement to arbitrate. As to these forty-four Plaintiffs, Groome Transportation relies on *Caley*'s holding that the FAA does not require a signature to satisfy the written-agreement requirement, but on this record, *Caley* provides no refuge for Groome Transportation. It is true that, as in *Caley*, the Arbitration Agreement is contained in Groome Transportation's Personnel Policy Handbook, and it also is uncontradicted that each of Groome Transportation's employees received a copy of the handbook. *See Caley*, 428 F.3d at 1359 n.1 (noting that the plaintiffs did not challenge the district court's conclusion that they had "sufficient notice of the [dispute resolution policy]"). But from there, this case parts ways with *Caley*.

A determinative fact in *Caley* was that, even though the plaintiffs had not signed the arbitration agreements, the policy included a written provision that "acceptance of employment or the continuation of employment by an individual

20

shall be deemed to be acceptance of the [dispute resolution policy]." *Id.* at 1365. Groome Transportation has not submitted evidence demonstrating that a similar written provision exists in this case. The closest Groome Transportation comes to providing such evidence is through Ms. Holcombe's affidavit. Mrs. Holcombe attests that, "*[a]s a condition of employment and/or continued employment*, the Personnel Policy Handbook has contained a mutually binding arbitration agreement since October 19, 2012." (Holcombe's Aff., at ¶ 4 (emphasis added).) It is not clear, however, whether Ms. Holcombe is attesting that the handbook itself expressly states that continued employment is acceptance of the arbitration provision, and she does not elaborate. Ms. Holcombe has not cited any provision of the Personnel Policy Handbook, and the handbook is not part of the record; hence, it is unknown whether the handbook is the source of authority for Ms. Holcombe's representation.

While Groome Transportation has submitted the one-page Arbitration Agreement, it does not contain a provision like the one in *Caley*. Instead, and unlike in *Caley*, the Arbitration Agreement contains signature lines for the employee and employer to acknowledge assent to arbitration, suggesting that Groome Transportation chose a signature as the method for the employee's acceptance of the Arbitration Agreement. While *Caley* does not require the parties' signatures as a prerequisite for a written agreement under the FAA, in

*Caley* the provision that continued employment constituted acceptance of the arbitration agreement itself was in writing.   Unlike in *Caley*, Groome has not submitted a writing evidencing that the Arbitration Agreement in the Personnel Policy Handbook was a "condition of employment and/or continued employment." (Holcombe's Aff., at ¶ 4.)  *Caley* does not provide grounds from which to conclude that there is a written agreement to arbitrate because there is no evidence of a written provision memorializing that Plaintiffs were deemed to have accepted the Arbitration Agreement by continuing their employment with Groome Transportation.   Ms. Holcombe's affidavit, to the extent it concludes that further employment is acceptance of the Arbitration Agreement, is belied by the testimony of Ms. Young, who refused to the sign the agreement and continued to work. Accordingly, Groome Transportation has not demonstrated a written agreement as to forty-four of the forty-five Plaintiffs.

### 2.    *Interstate Commerce*

Plaintiffs also contend that the interstate-commerce element of § 2 is not satisfied because their employment with Groome Transportation did not involve "interstate commuting," but instead was limited to transporting students in the immediate vicinity of Auburn's campus.  (Doc. # 18, at 2.)  Groome Transportation argues that for purposes of the FAA, "the general practice of employment involves

commerce, even when the employees are not engaged in interstate commerce."

(Doc. # 8, at 3.)  *Caley*, on this point, supports Groome Transportation's position.

> In *Caley*, the Eleventh Circuit explained that

> [t]he Supreme Court has interpreted the term "involving commerce" in the FAA as the functional equivalent of the more familiar term 'affecting commerce' – words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power. . . .  The Supreme Court also has clarified that "Congress' Commerce Clause power may be exercised in individual cases without showing any specific effect upon interstate commerce if in the aggregate the economic activity in question would represent a general practice subject to federal control.

428 F.3d at 1370 (quoting *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56–57,

(2003)).  In *Caley*, the Eleventh Circuit rejected the plaintiffs' argument that the

requisite commerce nexus under the FAA was missing because the "underlying

employment relationship d[id] not affect commerce."  *Id.*  It held that, "[b]ecause

[the employer's] overall employment practices affect[ed] commerce, the

Commerce Clause requirement [was] satisfied."  *Id.*; *see also Williams*, 2008 WL

686222, at *6 (explaining that, as to the commerce requirement, "[c]ourts

construing the language of section 2 in the context of an employment relationship

have generally focused on the nature of the defendant employer's business, not the

plaintiff employee's individual duties").

Here, like the plaintiffs in *Caley*, Plaintiffs take a "cramped view of

Congress' Commerce Clause power."  *Citizens Bank*, 539 U.S. at 58.  The issue is

not whether Plaintiffs' employment responsibilities were confined to intra-state shuttle bus services.  Rather, the focus is on Groome Transportation's overall employment practices.  Although admittedly the record is skimpy on the details of Groome Transportation's aggregate interstate-commerce effect, Plaintiffs have not countered Groome Transportation's assertion that the "general practice of employment involves commerce, even where the employees are not engaged in interstate commerce." (Doc. # 8, at 3.)  Moreover, contrary to Plaintiffs' argument in their brief, the Complaint is premised on the assumption that Groome Transportation's employment activities are "subject to federal control," namely, the FLSA and the WARN Act, and that Groome Transportation is "engaged in commerce [for] the production of goods" as contemplated by the FLSA.  (Doc. # 1, at 3, ¶ 6.)  At this stage, based upon the allegations in the Complaint, the Eleventh Circuit's decision in *Caley*, and the absence of contrary authority from Plaintiffs, the court finds that the Arbitration Agreement involves interstate commerce.  If it becomes necessary, upon proper motion, the court can reexamine the issue at a later date.

### 3.   *Conclusion*

Groome Transportation has the burden of demonstrating that § 2's requirements are met.  It has not met its burden of showing a written agreement to arbitrate as to all Plaintiffs, with the exception of Annie L. Adams.  The present

24

record is sufficient to demonstrate, however, the existence of an interstate-commerce nexus.  The issue of whether there is a written agreement under § 2 goes to the "making of the arbitration agreement," and the "making of the arbitration agreement" is "in issue" as to forty-four Plaintiffs.  Accordingly, the FAA requires that "the court shall proceed summarily to the trial thereof."  9 U.S.C. § 4.  Because Plaintiffs have not demanded a jury trial on this issue of the making of the arbitration agreement, the court will hold a bench trial.  *See Chastain*, 957 F.2d at 854–55.

## C.   Enforceability of the Arbitration Agreement

Plaintiffs also challenge the enforceability of the Arbitration Agreement. They contend that, under Alabama law, the Arbitration Agreement is not a binding contract and, thus, is not enforceable.  Their arguments focus on unconscionability and an alleged lack of mutual assent.  These arguments presently are relevant to Plaintiff Annie L. Adams, whom Groome Transportation has demonstrated entered into an Arbitration Agreement with it.  For purposes of this analysis, it will be assumed for argument only that § 2's requirements, as discussed in the preceding subsection, are satisfied.  Hence, it is appropriate at this time to address Plaintiffs' alternative arguments challenging the enforceability of the Arbitration Agreements.

1.    *Mutual Assent*

Courts generally should apply state law principles governing formation of contracts.  *See First Options*, 514 U.S. at 944.  Under Alabama law, Groome Transportation, as the party advocating arbitration, has the burden of showing the existence of a contract.  *Owens v. Coosa Valley Health Care, Inc.*, 890 So. 2d 983, 986 (Ala. 2004).  "The basic elements of a contract are an offer and an acceptance, consideration, and mutual assent to the essential terms of the agreement."  *Merchants Bank v. Head*, ___ So. 3d ___, 2014 WL 2242474, at *4 (Ala. May 30, 2014) (citation and internal quotation marks omitted).

To show the absence of a binding contract under Alabama law, Plaintiffs again point out that Groome Transportation has presented only one signed Arbitration Agreement, and that, "[i]n the absence of a signed arbitration agreement, there is no contract to arbitrate."[5]  (Doc. # 18, at 7.)  "The purpose of a signature on a contract is to show mutual assent; however, the existence of a contract may also be inferred from other external and objective manifestations of mutual assent."  *I.C.E. Contractors, Inc. v. Martin & Cobey Constr. Co.*, 58 So. 3d 723, 725–26 (Ala. 2010).   Stated differently, assent "must be manifested by

_____

[5] Plaintiffs also argue that Groome Transportation threatened to fire any employee who refused to sign the Arbitration Agreement.  In Plaintiffs' words, "[t]he use of fear of termination in order to manipulate employees to sign arbitration agreements shows a lack of mutual assent."  (Doc. # 18, at 7.)  The argument boils down to the contention that any Plaintiff who signed an arbitration agreement did so under coercion or duress.  This argument is analyzed in the next part addressing Plaintiffs' unconscionability arguments.

something.  Ordinarily, it is manifested by a signature.  However, assent may be manifested by ratification."[6]  *Baptist Health Sys., Inc. v. Mack*, 860 So. 2d 1265, 1273 (Ala. 2003) (emphasis and alterations omitted).  Hence, under *Baptist Health*, an employee's signature is not the only way for an employee to assent to the terms of an arbitration agreement.  In *Baptist Health*, the employer gave the plaintiff a document titled, "Dispute Resolution Program," requiring binding arbitration and expressly providing that the employee's continued employment manifested the employee's acceptance of the arbitration agreement.  The Alabama Supreme Court held that the employee, "by continuing her employment . . . subsequent to her receipt of the Program document, expressly assented to the terms of the Program document and [was] therefore bound by the arbitration provision contained in that document."[7]  *Id.* at 1274.

Groome Transportation contends that each Plaintiff's continued employment after receipt of the Arbitration Agreement is conduct that, under Alabama law,

---

[6] The issue of whether there is a written agreement under the FAA, which was addressed in Part V.B.1, and whether there is a binding contract under state law are separate issues.  *See Caley*, 428 F.3d at 1369 n.10 (The Eleventh Circuit explained that, "[w]hether continued employment can constitute acceptance of a contractual offer, and thus whether the [arbitration agreement] is a binding contract, is a different contract issue [than whether there is a written agreement to arbitrate, which is] to be decided under state law.").  Although the analysis on its face appears redundant with that in Part V.B.1., because the former issue is a matter of federal law and the latter a matter of state law, the issues require separate analysis, even though in this case the factual predicate and the result are the same.

[7] The employee in *Baptist Health* also signed an acknowledgement form, but the holding did not turn on that fact.

indicates each Plaintiff's mutual assent to the terms of the Arbitration Agreement. Plaintiffs have not contradicted Groome Transportation's evidence that they all received a copy of the Personnel Policy Handbook containing the Arbitration Agreement.  (Holcombe's Aff., at ¶ 4 ("Each employee receives a copy of the Personnel Policy Handbook," which since October 19, 2012, has contained an Arbitration Agreement.).)  But there is an important distinction between the facts of this case and those in *Baptist Health*.  As discussed Part V.B.1., the one-page Arbitration Agreement here does not include a written provision that stipulates that continued employment constitutes the employee's acceptance of the agreement, and Groome Transportation has not pointed to any provision in the Personnel Policy Handbook (or even submitted it) that contains such a stipulation.  Rather, again, as discussed earlier in this opinion, Ms. Holcombe's attestation – that, "[a]s a condition of employment and/or continued employment, the Personnel Policy Handbook has contained a mutually binding arbitration agreement since October 19, 2012" – does not reveal whether Ms. Holcombe is attesting that the handbook itself includes an express written term that continued employment is deemed acceptance of the arbitration provision.  To the contrary, in *Baptist Health*, the plaintiff indisputedly received an employer-created document with an *express written* term conditioning acceptance of an arbitration agreement upon continued employment.

28

In sum, Groome Transportation has not submitted sufficient evidence demonstrating that it notified its employees in writing that acceptance of the Arbitration Agreement was a prerequisite for continued employment, and, thus, *Baptist Health* does not support its position.  As no other arguments or authority have been advanced by Groome Transportation,[8] the court finds that it has not carried its burden of showing the formation of an Arbitration Agreement between it and Plaintiffs (save Annie L. Adams).  The § 4 trial also will be addressed to whether under state law, the forty-four Plaintiffs gave mutual assent to binding arbitration.

### 2.   *Scope of the Arbitration Agreement*

Plaintiffs' arguments challenging the scope of the Arbitration Agreement are twofold.  Each argument is addressed in turn.

### (a)   **Claims that Preceded the Implementation of the Arbitration Agreement**

Plaintiffs argue that the FLSA claims are not within the scope of the Arbitration Agreement because Groome Transportation's failure to pay overtime

---

[8] It is worth noting again that the Arbitration Agreement contains signature lines for the employee and employer to sign to acknowledge assent to arbitration.  Under comparable circumstances, a district court applying Florida law refused to "infer acceptance of the arbitration agreement from Plaintiff's acceptance of employment with Defendant."  *Schoendorf v. Toyota of Orlando*, No. 08cv767, 2009 WL 1075991, at *8 (M.D. Fla. Apr. 21, 2009).  As in this case, the arbitration agreement did not define acceptance as continued employment.  *Id.*  Rather, the agreement provided spaces for signatures, and, "in this way, the arbitration agreement defined the appropriate method of acceptance as the signatures of the parties."  *Id.*

wages between April 1, 2012, and November 30, 2012, occurred prior to January 23, 2013, the date upon which the lone Arbitration Agreement was signed. (*See* Doc. # 18, at 6–7.)   In other words, Plaintiffs contend that the Arbitration Agreement does not cover claims that arose from conduct that took place prior to the Arbitration Agreement's implementation.  But Plaintiffs cite no authority for their argument, and Groome Transportation responds that the Arbitration Agreement's use of the determiner "any" is broad enough to cover all claims – past, present, and future – and, thus, necessarily "all claims in this case." (Doc. # 21, at 11.)

As an initial matter, the parties do not address what body of law applies to their arguments with respect to the scope of the Arbitration Agreement.[9]   "To determine which disputes between the parties to an enforceable arbitration agreement are covered by the language of the arbitration clause, we 'apply[ ] the federal substantive law of arbitrability,' which is 'applicable to any arbitration agreement within the coverage of the FAA.'"   *Klay*, 389 F.3d at 1200 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985)).  The Sixth Circuit has opined on the breadth of an arbitration clause covering "any dispute":

> When faced with a broad arbitration clause, such as one covering any
> dispute  arising  out  of  an  agreement,  a  court  should  follow  the

---

[9] Groome Transportation relies upon Alabama law, but with no explanation.

> presumption of arbitration and resolve doubts in favor of arbitration. Indeed, in such a case, only an express provision excluding a specific dispute, or the most forceful evidence of a purpose to exclude the claim from arbitration, will remove the dispute from consideration by the arbitrators.

*NCR Corp. v. Korala Assocs. Ltd.*, 512 F.3d 807, 813 (6th Cir. 2008) (internal quotation marks omitted); *see also Grand Wireless, Inc. v. Verizon Wireless, Inc.*, 748 F.3d 1, 8 (1st Cir. 2014) (observing that the presumption is "particularly appropriate" where "the arbitration is broadly worded"). This general principle – the presumption of arbitrability in the face of an expansive arbitration clause – emanates from Supreme Court precedent. *See AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986) (In "such cases" where the arbitration agreement is "broad," "[i]n the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail."). And, in light of these principles, one district court has recognized that courts considering arbitration provisions covering "any disputes" with no express exclusions as to the scope of the agreement "cover claims that arose before the effective date of the arbitration agreement. . . ." *Vallejo v. Garda CL Sw., Inc.*, No. H-12-0555, 2013 WL 391163, at *9 (S.D. Tex. Jan. 30, 2013) (collecting cases).

The Arbitration Agreement in Groome Transportation's Personnel Policy Handbook is broadly worded. It applies to "any dispute, controversy or claim,"

with no limitations as to its scope.  The agreement has no express exclusion that precludes the parties from arbitrating past claims that pre-date the implementation of the Arbitration Agreement, and, thus, the presumption of arbitrability applies. Plaintiffs have not submitted any evidence, much less forceful evidence, that refutes the presumption.  Moreover, even if there was room for debate about the meaning of "any" in the Arbitration Agreement, the presumption of arbitrability would still control and require arbitration of preexisting claims.  *See Granite Rock Co. v. Int'l Broth. of Teamsters*, 561 U.S. 287, 301 (2010) (explaining that the presumption of arbitrability will apply if "a validly formed and enforceable arbitration agreement is ambiguous about whether it covers the dispute at hand"). For these reasons, Plaintiffs cannot avoid arbitration on grounds that the Arbitration Agreement does not cover past alleged employer misconduct.

### (b)    Arbitration of Federal Statutory Claims

Relatedly, Plaintiffs argue that the Arbitration Agreement does not fairly apprize them that they have to arbitrate federal statutory claims.  They rely upon *Paladino v. Avnet Computer Technologies, Inc.*, 134 F.3d 1054 (11th Cir. 1998). Although in *Paladino* the Eleventh Circuit held that the arbitration clause failed to give the plaintiff fair notice that the arbitration agreement covered federal statutory claims, *Paladino*'s teachings indicate that the Arbitration Agreement here does indeed bar litigation of Plaintiffs' FLSA and Warn Act claims.

*Paladino* explained that an arbitration agreement does not have to "specifically list every federal or state statute it purports to cover." *Id.* at 1059.  It cited the arbitration clause in *Bender v. A.G. Edwards & Sons, Inc.*, 971 F.2d 698, 700 (11th Cir. 1992), which required arbitration for "any dispute, claim or controversy," as an example of "clear language" requiring the parties to arbitrate their federal statutory claims.  *Paladino*, 134 F.3d at 1059.  As the Eleventh Circuit has made plain in a post-*Paladino* decision, an agreement to arbitrate "any action, dispute, claim, counterclaim or controversy" between the parties includes the arbitration of statutory claims because "[a]ny disputes means all disputes, because 'any' means 'all.'"  *Anders v. Hometown Mortg. Servs., Inc.*, 346 F.3d 1024, 1028 (11th Cir. 2003) (quoting *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1187 (11th Cir. 1997)).

Here, the Arbitration Agreement's language is similar to that in *Bender* and *Anders*, as it requires the parties to arbitrate "any dispute, controversy or claim." (Ex. A to Doc. # 8.)  According to *Anders*, "any" means "all," and "all" necessarily includes federal statutory claims.  Based upon this broad language, the Arbitration Agreement "generally and fairly informs the signatories that it covers statutory claims."  *Paladino*, 134 F.3d at 1059.  Accordingly, the FLSA and WARN Act claims are within the scope of the Arbitration Agreement.

### 3.    *Unconscionability*

Plaintiffs contend alternatively that, even if the making of the Arbitration Agreement were not at issue, it is "void under Alabama law as unconscionable." (Doc. # 18, at 5.)  They assert that the Arbitration Agreement is unconscionable for four reasons:    (1) it requires arbitration in a Virginia forum; (2) it contains "nonsensical" language; (3) any employee who signed an arbitration agreement did so only under "extreme coercion and duress" in the face of a threat of termination; and (4) it potentially restricts them from pursuing their claims in a class action. (Doc. # 18, at 5–6.)   These arguments are addressed to whether "legal constraints external to the parties' agreement foreclose[ ] arbitration." *Klay*, 389 F.3d at 1200.

Arbitration agreements "may be held unenforceable . . . if, under the controlling state law of contracts, requiring arbitration of a dispute would be unconscionable." *Cappuccitti v. DirecTV, Inc.*, 623 F.3d 1118, 1124 (11th Cir. 2010).   "Thus, generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements." *Dale v. Comcast Corp.*, 498 F.3d 1216, 1219 (11th Cir. 2007).   "Under Alabama law, arbitration provisions are not per se unconscionable." *Providian Nat'l Bank v. Screws*, 894 So. 2d 625, 628 (Ala. 2003).   Instead, "unconscionability is an affirmative defense to the enforcement of a contract, and the party asserting that defense bears the burden of proving it by substantial evidence." *Bess v. Check*

34

*Express*, 294 F.3d 1298, 1306–07 (11th Cir. 2002) (citing *Green Tree Fin. Corp. v. Wampler*, 749 So. 2d 409, 415, 417 (Ala. 1999)).  "Because Alabama law allows unconscionability to invalidate contracts generally, this defense, consistent with the FAA, may also invalidate the arbitration agreement in this case if [the plaintiff] proves unconscionability by substantial evidence."  *Id.* at 1307.  "The applicable standards for determining unconscionability are . . . whether there are (1) terms that are grossly favorable to a party that has (2) overwhelming bargaining power." *Steele v. Walser*, 880 So. 2d 1123, 1129 (Ala. 2003) (citations and internal quotation marks omitted).  For the reasons to follow, Plaintiffs fail to demonstrate that, to the extent that any Plaintiff and Groome Transportation entered into an agreement to arbitrate (such as in the case of Plaintiff Annie L. Adams), the Arbitration Agreement is unconscionable.

### (a)   Virginia Forum (Forum-Selection Clause)

Plaintiffs argue that "to require any member of the class defined in the Complaint to arbitrate his or her claim in Richmond[,] Virginia, separate and apart from the group that was laid off in mass, would be unconscionable and therefore, unenforceable."  (Doc. # 18, at 9.)  Groome Transportation counters that Plaintiffs have failed to put forth evidence that the forum-selection clause is invalid and contends, in particular, that Plaintiffs have not shown that Virginia would be a "seriously inconvenient forum."  (Doc. # 21, at 9.)

35

Initially, it is unclear from the scant argument and lack of citation to authority whether Plaintiffs are contending that the forum-selection clause alone is unconscionable or whether they are arguing that the Arbitration Agreement as a whole is unconscionable based upon the inclusion of the forum-selection clause. The distinction is important.  As commented upon by the Second Circuit, the "Supreme Court has explained that a challenge to arbitration on the basis of unconscionability must be directed at the agreement to arbitrate itself." *Duran v. J. Hass Grp., L.L.C.*, 531 F. App'x 146, 147 (2d Cir. 2013) (citing *Rent-A-Center*, 561 U.S. at 63).  Where the plaintiff "claim[s] the arbitration agreement itself [is] unconscionable due to the forum selection clause," the court "consider[s] whether the arbitration agreement [is] unconscionable . . . ." *Id.*  Where there is a valid arbitration agreement, however, "the arbitrator, rather than the court, . . . decide[s] in the first instance whether the forum selection clause [is] unconscionable." *Id.* For purposes of this opinion, it will be assumed that Plaintiffs are contending that the Arbitration Agreement is unconscionable because it contains a forum-selection clause, rather than that the forum-selection clause alone is unconscionable.  *Id.*

Within these parameters, the issue is whether Plaintiffs have shown that the forum-selection clause renders the Arbitration Agreement "grossly favorable" to Groome Transportation and whether Groome Transportation had "overwhelming bargaining power." *Steele*, 880 So. 2d at 1129.  Plaintiffs fall short of meeting

their burden.  Their sole argument is that class members should not have to litigate the WARN Act claims "separate and apart from the group that was laid off in mass" (Doc. # 18, at 9), but they fail to explain how this effect renders the Arbitration Agreement so "grossly favorable" to Groome Transportation as to demonstrate unconscionability.  Plaintiffs offer no authority establishing that the potential that WARN Act claims brought by former employees of Groome Transportation will proceed in different forums is grounds for invalidating an arbitration agreement.  Because Plaintiffs have not demonstrated terms that are "grossly favorable" to Groome Transportation, it is unnecessary to address the unconscionability doctrine's second element addressed to bargaining power.  It is noteworthy though, that as emphasized by the Alabama Supreme Court, under U.S. Supreme Court precedent, "'[m]ere inequality in bargaining power . . . is not a sufficient reason to hold that arbitration agreements are never enforceable in the employment context.'"  *Gayfer Montgomery Fair Co. v. Austin*, 870 So. 2d 683, 691 (Ala. 2003) (quoting *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 33 (1991)).  Accordingly, Plaintiffs' argument that the forum-selection clause renders the Arbitration Agreement unconscionable is not persuasive.

### (b)     Nonsensical Language

Plaintiffs next contend that the wording of the Arbitration Agreement "commingles the distinctly different processes of mediation and arbitration."

(Doc. # 18, at 7–8.)  They point to the following provision:  "Arbitration shall be administered and conducted under the Mediation Rules by mediators of the American Arbitration Association."  Plaintiffs argue that this language creates an ambiguity as to whether the agreement is "an agreement to mediate or an agreement to arbitrate," and that "[a]n arbitration agreement that is nonsensical as to rules under which the arbitration is to be conducted is unenforceable."  (Doc. # 18, at 8.)

Groome Transportation responds that the intent of the parties is the key inquiry and points to a different provision of the Arbitration Agreement that it says clearly shows the parties' intent to arbitrate.  That provision reads:  "[E]ach party fully understands and agrees that they are giving up certain rights otherwise afforded to them by civil court actions, including but not limited to a jury trial."  (Doc. # 21, at 5.)  Groome Transportation contends that Plaintiffs cannot unwind the Arbitration Agreement "by quoting one sentence from the agreement."  (Doc. # 21, at 5.)

Determining the parties' intent is a question of law for the court.  *Paladino v. Avnet Computer Techs., Inc.*, 134 F.3d 1054, 1058 (11th Cir. 1998).  Groome Transportation relies upon *Sheet Metal Workers International Association Local 15, AFL-CIO v. Law Fabrication*, 237 F. App'x 543 (11th Cir 2007).  In *Sheet Metal Workers*, the arbitration clause contained a typographical error – "of"

38

inadvertently was inserted instead of "or."[10]  *Id.* at 547–48.  Notwithstanding that "the language read literally [was] nonsensical" given the typographical error, the Eleventh Circuit concluded that "the intent of the parties [was] perfectly clear from the face of the agreement" and that the arbitration clause was enforceable.  *Id.* at 548.

The face of the Arbitration Agreement, although it includes two references to mediation, also discloses terms evidencing an intent to arbitrate.   The Agreement expressly commits the parties to resolve disputes through "binding arbitration."   The parties' intent to submit their disputes to arbitration further is revealed (1) in the title of the agreement, "Arbitration Clause and Agreement," (2) by the inclusion of the AAA's telephone number for an employee to obtain answers to "questions about the arbitration process," (3) by the language requiring that the AAA rules govern "[d]iscovery in any arbitration proceeding," and (4) by the acknowledgment that the "agreement to arbitrate is freely negotiated." Additionally, the agreement expressly sets out that it constitutes a waiver of the right to a jury trial in a court action.   The waiver of the right to a jury trial is consistent with an agreement to arbitrate, not an agreement to mediate.   *See Cooper v. MRM Inv. Co.*, 367 F.3d 493, 506 (6th Cir. 2004) ("If the claims are

---

[10] The typographical error in the arbitration agreement provided that "the obligation to arbitrate is triggered when there is a deadlock in 'negotiations for a renewal of this Agreement of [sic] negotiations regarding a wage/fringe reopener.'"  *Sheet Metal Workers*, 237 F. App'x at 547–48.

properly before an arbitral forum pursuant to an arbitration agreement, the jury trial right vanishes.").

Moreover, no Plaintiff presents facts that suggest the parties intended not to arbitrate their disputes. For example, no Plaintiff submits evidence that he or she did not understand the agreement to encompass arbitration or that he or she inquired about the meaning of the agreement. The sole plaintiff-affiant refers unambiguously to the agreement nine times as an "arbitration agreement" and does not indicate any confusion as to whether Groome Transportation was asking her to mediate instead of to arbitrate disputes. (*See, e.g.*, Young's Aff., at 2 ("I was presented an arbitration agreement for my signature . . . .").) Unfortunately for Plaintiffs, in the arbitration arena, any ambiguity created by the two references to "mediation" and "mediator" in one sentence of the agreement has to be construed in favor of arbitration. *See generally EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002) ("[A]mbiguities in the language of the agreement should be resolved in favor of arbitration . . . ."); *see also Pacheco v. PCM Const. Servs., LLC*, No. 12cv4057, 2014 WL 145147, at *5 (N.D. Tex. Jan. 15, 2014) ("[T]o the extent Plaintiffs contend that the arbitration provision is ambiguous because its inclusion of the words "arbitración" and "mediación," the court must construe any such ambiguity in favor of arbitration." (citing *Klein v. Nabors Drilling USA, L.P.*, 710 F.3d 234, 237 (5th Cir. 2013)). The provision of the Arbitration Agreement that

40

Plaintiffs point out no doubt is poorly drafted, admittedly much more so than the typographical error in *Sheet Metal Workers*.   In the end, though, Plaintiffs' argument that the Arbitration Agreement's terminology is confusing and renders the agreement unconscionable lacks support in the Arbitration Agreement itself, the evidence, and the law.

### (c)   Duress

Plaintiffs argue that any employee who signed an Arbitration Agreement did so under the threat of termination and that, therefore, the agreement was formed under duress and is unconscionable.   The Supreme Court of Alabama's decision in *Potts v. Baptist Health System, Inc.*, 853 So. 2d 194 (Ala. 2002), forecloses this argument.   In *Potts*, the court rejected the employee's argument that her employer's demand that she sign an acknowledgement form accepting arbitration as the means for resolving legal disputes or face termination, rendered the arbitration agreement unconscionable. *See id.* at 204–07.   "[T]he possibility of termination flowing from [the plaintiff's] refusal to sign an acknowledgement form is not, in and of itself, unconscionable." *Id.* at 206.   The plaintiff presented no evidence, other than her employer's threat of termination, and, thus, the court was "unable to conclude that the circumstances surrounding [the plaintiff's] acceptance of continued employment with the defendants were unconscionable." *Id.* at 207; *see also Williams v. Parkell Prods., Inc.*, 91 F. App'x 707, 708 (2d Cir. 2003) ("It

41

is well-settled . . . that conditioning employment on the acceptance of an agreement to arbitrate disputes, including those arising under civil rights laws, is not itself unlawfully coercive." (citing *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 123–24 (2001)).

As in *Potts*, Plaintiffs rely solely upon Groome Transportation's threat of termination if they did not sign an Arbitration Agreement, and that simply is not enough under Alabama law to demonstrate unconscionability.   Accordingly, Plaintiffs' argument that the Arbitration Agreement is unconscionable because any Plaintiff who executed one did so under duress is rejected.

### (d)    Class-Action Preclusion

Plaintiffs argue that any restriction in the Arbitration Agreement on their right to pursue a class action is unconscionable under Alabama law.  They contend that the Arbitration Agreement does not explicitly inform them that they have "to arbitrate the statutory right to a class remedy provided in the WARN Act."  (Doc. # 18, at 9.)   The Arbitration Agreement's silence on this issue, according to Plaintiffs, means that they are under "no obligation . . . to arbitrate these statutory claims."  (Doc. # 18, at 9.)  Plaintiffs rely on *Paladino*, but as explained below, that reliance is misguided.  Plaintiffs further contend that two Eleventh Circuit decisions holding class-action waivers unconscionable under Georgia law require the same result under Alabama law and that a finding of unconscionability is even

stronger here because the Arbitration Agreement does not contain a class-action waiver. But Plaintiffs' reliance on these decisions also is unavailing, and Plaintiffs omit discussion of important Supreme Court decisions.

It is helpful initially to address the effect of a valid arbitration agreement's silence as to the availability of class-wide relief *in the arbitrable forum*. Under Alabama law, "classwide arbitration is permitted only when the arbitration agreement provides for it." *Taylor v. First N. Am. Nat'l Bank*, 325 F. Supp. 2d 1304, 1320 n.28 (M.D. Ala. 2004) (citing *Med. Ctr. Cars, Inc. v. Smith*, 727 So. 2d 9, 20 (Ala. 1998)); *see also Hornsby v. Macon Cnty. Greyhound Park, Inc.*, No. 10cv680, 2012 WL 2135470, at *9 (M.D. Ala. June 13, 2012) (explaining that, because the arbitration agreement "says nothing about classwide arbitration," Alabama's "default rule, that 'classwide arbitration is permitted only when the arbitration agreement provides for it,' kicks in." (quoting *Taylor*, 325 F. Supp. 2d at 1320 n.28). Based upon these authorities, if Plaintiffs ultimately are required to arbitrate their disputes, class-wide arbitration would be unavailable because the Arbitration Agreement does not expressly provide for it.

Moreover, and more to the point for purposes of this opinion, the fact that there is no class-action vehicle available to Plaintiffs in the arbitral forum does not mean, as Plaintiffs contend, that the Arbitration Agreement is unenforceable and that class litigation is available in a judicial forum. As the district court

43

highlighted in *Hornsby*, "the Eleventh Circuit has held that arbitration clauses are enforceable even when their application may effectively prevent plaintiffs from pursuing their claims as a class action." 2012 WL 2135470, at *9 (citing *Caley*, 428 F.3d at 1378, which rejected the plaintiffs' argument that the arbitration agreement was unconscionable under Georgia law because it "preclude[d] class actions"). And post-*Caley*, the Supreme Court has ruled that "a party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so" and that consent to class arbitration cannot be inferred where the agreement is silent as to the availability of class-action procedures. *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 684 (2010).

Notwithstanding the foregoing authorities, Plaintiffs portend that *Paladino* supports their position that they may proceed in this court with a class action. They point to *Paladino*'s holding that "a mandatory arbitration clause does not bar litigation of a federal statutory claim, unless . . . the agreement [ ] authorize[s] the arbitrator to resolve federal statutory claims. . . ." 134 F.3d at 1059 (citation and internal quotation marks omitted). Plaintiffs argue that, because the Arbitration Agreement does not expressly give the arbitrator authority to resolve federal statutory claims *on a classwide basis*, *Paladino*'s "rules for dealing with statutory claims . . . have not been met." (Doc. # 18, at 9.) But Plaintiffs' argument

confuses a procedural vehicle (the class action) with the substantive statutory claim (the WARN Act claim). "[T]he right of a litigant to employ Rule 23 is a procedural right only, ancillary to the litigation of substantive claims." *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 332 (1980) (citing Fed. R. Civ. P. 23). And "[t]he availability of the class action Rule 23 mechanism *presupposes* the existence of a claim." *Parisi v. Goldman, Sachs & Co.*, 710 F.3d 483, 488 (2d Cir. 2013). *Paladino* addressed what is required for an arbitration agreement to cover federal statutory *claims*, not what is required for an arbitration agreement to establish a procedural right to a class action for the vindication of those statutory claims. *Paladino* simply is inapposite for the point Plaintiffs attempt to make.

Plaintiffs' next argument – that the Arbitration Agreement is unconscionable because it effectively precludes class-action procedures – relies on two Eleventh Circuit decisions that held that an arbitration agreement's waiver of the right to proceed with a class action was unconscionable under Georgia law.[11] (Doc. # 18, at 9 (citing *Dale v. Comcast Corp.*, 498 F.3d 1216 (11th Cir. 2007), and *Jones v. DirecTV, Inc.*, 381 F. App'x 895 (11th Cir. 2010).) Specifically, Plaintiffs quote *Jones*'s discussion preceding its holding that the class-action waiver at issue was unconscionable under Georgia law:

---

[11] Plaintiffs recognize that the Arbitration Agreement here "contains no waiver of [ ] the right to participate in a class action at all – let alone a waiver of the action . . .[,]" but they argue "even if there were an agreement not to participate in a class action, the agreement would be unconscionable and unenforceable." (Doc. # 18, at 10.)

The district court denied the motion to arbitrate filed by DirecTV. The district court ruled that the waiver of the right to represent a class in Jones's agreement was unconscionable based on our decision in *Dale v. Comcast Corp.*, 498 F.3d 1216 (11th Cir. 2007). The district court reasoned that *Jones* and the class she sought to represent would have little incentive to pursue arbitration based on "the limited potential recovery" available. We held in *Dale* that a waiver of a class action in an arbitration agreement is unconscionable under Georgia law when the "cost of vindicating an individual subscriber's claim . . . is too great." *Id.* at 1224. We explained that several factors are relevant in determining the enforceability of a waiver of a class action, including the "fairness of the provisions," the cost of individual arbitration in comparison to the potential recovery, the likelihood that attorney's fees and expenses could be recovered, the power the waiver gave the company "to engage in unchecked market behavior," and "related public policy concerns." *Id.* We ruled that the waiver of a class action in the Comcast contract was unconscionable because it undermined a public policy favoring the pursuit of small-value claims to deter companies from misconduct and discouraged arbitration by consumers who sought small judgments, but bore significant costs and would otherwise experience difficulty obtaining representation. *Id.*

*Id.* at 896.

Plaintiffs contend that the economic-feasibility, Georgia-law principles discussed in *Dale* and *Jones* "also are expressed in Alabama law" in *Leonard v. Terminix International Co.*, 854 So. 2d 529, 536–37 (Ala. 2002). At issue in *Leonard* was whether an arbitration agreement that precluded resolution of disputes through class-action procedures was unconscionable under Alabama law. The *Leonard* court concluded that the arbitration agreement between a pesticide company and a homeowner was "unconscionable by reason of economic feasibility." 854 So. 2d at 537. The value of each plaintiff's claim was small (less

46

than $500), but the baseline amount of fees required of the plaintiffs in arbitration would have been $1,150. *Id.* at 535. The Alabama Supreme Court held that the "arbitration agreement [was] unconscionable" because the plaintiffs' "expense of pursuing their claim far exceed[ed] the amount in controversy," *id.* at 539. Moreover, because the agreement precluded recovery for "indirect, special, and consequential damages or loss of anticipated profits" and foreclosed class-action procedures, the plaintiffs were "deprive[d] . . . of a meaningful remedy." *Id.* at 538. The arbitration agreement was, therefore, unenforceable.

Plaintiffs argue that Alabama's law on unconscionability parallels Georgia's law and that, therefore, *Dale* and *Jones* require invalidation of the Arbitration Agreement. They contend that each individual Plaintiff's potential recovery under the FLSA is for "a relatively small sum of money," and, thus, the denial of the class-action vehicle will "effectively insulat[e]" Groome Transportation from liability. (Doc. # 18, at 11.)

At first blush, these decisions appear to support Plaintiffs' position, but *Dale* and *Jones* predate the Supreme Court's decisions in *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011), and *American Express Co. v. Italian Colors Restaurant*, 133 S. Ct. 2304 (2013). *Concepcion* and *Italian Colors* provide the appropriate starting point for addressing Plaintiffs' arguments, even though Plaintiffs neglect to mention them.

47

In *Concepcion*, the plaintiffs, individually and as proposed representatives of a class, filed a lawsuit in federal court alleging that AT&T Mobility had "engaged in false advertising and fraud by charging sales tax on phones it advertised as free." 131 S. Ct. at 1744.  AT&T Mobility moved to compel arbitration based upon the parties' agreement, but the plaintiffs countered that the arbitration agreement was unconscionable because it contained a class-action waiver that effectively "'exempt[ed] . . . [AT&T Mobility] from responsibility for [its] own fraud.'"  *Id.* at 1746 (quoting *Discovery Bank v. Superior Ct.*, 113 P.3d 1100, 1110 (2005)). The lower courts agreed and held that the class-action waiver was unconscionable under applicable California law.  The Supreme Court granted certiorari to decide whether the saving clause in § 2 of the FAA "preempt[ed] California's rule classifying most collective-arbitration waivers in consumer contracts as unconscionable."  *Id.*; *see also* § 2 (providing that arbitration agreements are enforceable, "save upon such grounds as exist at law or in equity for the revocation of any contract."  ("saving clause")).

The plaintiffs argued that California's rule (*i.e.*, "the *Discover Bank* rule") fell within the saving clause and invalidated the arbitration agreement.  Addressing this argument, the Supreme Court explained how the FAA's preemptive force works.  "When state law prohibits outright the arbitration of a particular type of claim, the analysis is straightforward:  The conflicting rule is displaced by the

FAA." *Concepcion*, 131 S. Ct. at 1747. "But the inquiry becomes more complex when a doctrine normally thought to be generally applicable, such as . . . unconscionability, is alleged to have been applied in a fashion that disfavors arbitration." *Id.* In the end, "[a]lthough § 2's saving clause preserves generally applicable contract defenses, nothing in it suggests an intent to preserve state-law rules that stand as an obstacle to the accomplishment of the FAA's objectives." *Id.* at 1748. The Court concluded that "[r]equiring the availability of classwide arbitration interferes with fundamental attributes of arbitration and thus creates a scheme inconsistent with the FAA," and that, therefore, the FAA preempted California's *Discovery Bank* rule. *Id.* Accordingly, it held that the arbitration agreement should have been enforced.

In this case, Plaintiffs' argument, distilled to its essence, is that the Alabama Supreme Court's opinion in *Leonard* supplies a rule of unconscionability that "exist[s] at law or in equity for the revocation of any contract" under § 2's saving clause. 9 U.S.C. § 2. Another judge of this court in the post-*Concepcion* era addressed essentially the same argument that Plaintiffs make and succinctly framed the issues as follows: "[W]hether (1) Alabama's unconscionability doctrine as applied in *Leonard* . . . governs this case and (2) if so whether, under *Concepcion*, this rule impermissibly conflicts with the purposes of the FAA." *Hornsby*, 2012 WL 2135470, at *7. The Arbitration Agreement is not unconscionable for the

same reason that the *Hornsby* arbitration agreement was not (simply stated, because *Leonard* does not govern), and the well-reasoned analysis in *Hornsby* streamlines the present analysis.  Three points support this conclusion.

First, the Arbitration Agreement contains no limitations on the recovery of damages.  *See id.*, at *8 ("[C]ourts have uniformly rejected *Leonard*-based unconscionability challenges where there was no restriction on damages or other sorts of remedy." (collecting cases)).  Second, while Plaintiffs contend that their potential recoveries are limited under the WARN Act to sixty days in wages and that the potential recovery under the FLSA may "be even smaller," (Doc. # 18, at 10), they make no contention, as did the plaintiffs in *Leonard*, "that their potential recovery in arbitration will be necessarily smaller than the amount they will be required to spend just to arbitrate the case . . . ."  *Hornsby*, 2012 WL 2135470, at *9.  Where there is not "economic-unfeasibility," the facts fall "well outside of *Leonard*'s core concern."  *Id.* (internal quotation marks omitted).  Third, Plaintiffs rely largely on a policy argument – that class-action litigation provides a less burdensome vehicle for prosecuting their claims.  (*See* Doc. # 18, at 10–12.) But, as the court put it in *Hornsby*, the fact that it may "be more efficient to proceed as a class" is not to say that the prohibition of class-action procedures is unconscionable under Alabama law.  2012 WL 2135470, at *9.  The Supreme Court's decision in *Italian Colors*, decided after *Hornsby*, further confirms that

"the FAA's command to enforce arbitration agreements trumps any interest in ensuring the prosecution of low-value claims."[12]  133 S. Ct. at 2312 n.5.

Based on the foregoing, the Arbitration Agreement is not unconscionable under *Leonard* and, therefore, *Leonard* does not govern the outcome here.  As in *Hornsby*, which reached the same conclusion, the court finds that it is unnecessary to reach the second issue concerning whether *Leonard* "impermissibly conflicts with the purposes of the FAA" so as to be preempted.  *Hornsby*, 2012 WL 2135470, at *7.  But it is notable that Plaintiffs' ability to survive an FAA preemption argument is called into question not only by *Concepcion*, but also by *Italian Colors*.  In *Italian Colors*, each class member's maximum statutory recovery would have been $38,549, while the cost of proving the claims would have been at least several hundred thousand dollars and potentially over a million dollars.  While the plaintiffs might have "no economic incentive to pursue their antitrust claims individually in arbitration," the Court held the class-action waivers enforceable.  Although not an FAA preemption case as in *Concepion*, the *Italian Colors* Court noted that *Concepcion* had "all but resolve[d] this case" because that

---

[12] The Supreme Court's decision in *Italian Colors* also exposes a potential flaw in Plaintiffs' argument that the "presence of the class action language in the WARN Act" is a factor that "leads inexorably to the conclusion that all of the aggrieved employees have the right to participate in this class action." (Doc. # 18, at 10–11; *see also* Doc. # 18, at 6 ("The WARN Act, by its terms, anticipates a class action, and to order arbitration would effectively preclude the class remedy provided by Statute.").)  In *Italian Colors*, the Court explained that, in a prior decision, it "had no qualms in enforcing a class waiver in an arbitration agreement even though the federal statute at issue, the Age Discrimination in Employment Act, expressly permitted collective actions."  133 S. Ct. at 2311 (citing *Gilmer*, 500 U.S. at 20).

decision "specifically rejected the argument that class arbitration was necessary to prosecute claims 'that might otherwise slip through the legal system.'"  133 S. Ct. at 2312.  Indeed, the Court went so far as to state in a footnote that *Concepcion* was not solely a preemption decision but one that "established . . . that the FAA's command to enforce arbitration agreements trumps any interest in ensuring the prosecution of low-value claims."  *Id.* at 2312 n.5.  In sum, the court rejects Plaintiffs' contention that any restriction in the Arbitration Agreement on the right to pursue a class action is unconscionable under Alabama law.

## VI.  CONCLUSION

At issue is whether the forty-five Plaintiffs entered into valid Arbitration Agreements requiring them to arbitrate their FLSA and WARN Act claims against Groome Transportation.  As to one Plaintiff, Annie L. Adams, she signed an Arbitration Agreement that is enforceable.  There is no evidence of any defects to the agreement's formation, such as lack of mutual assent, and Ms. Adams's disputes fall within the scope of that agreement.  Furthermore, Ms. Adams has not shown grounds for revocation of the Arbitration Agreement for reasons of unconscionability or duress.  Accordingly, it is ORDERED that Groome Transportation's motion to compel arbitration (Doc. # 8) is GRANTED as to Plaintiff Annie L. Adams.  Pursuant to 9 U.S.C. §§ 3–4, Plaintiff Annie L. Adams is ORDERED to submit this dispute to arbitration in the manner provided for in the

arbitration clause.  Ms. Adams's action will be STAYED pending arbitration.  Ms. Adams shall file a jointly prepared report regarding the status of arbitration proceedings on or before **November 17, 2014**, and every ninety (90) days thereafter, until this matter is resolved.

It is further ORDERED that, as to the remaining forty-four Plaintiffs, there exists a genuine dispute as to the making of arbitration agreements.  Accordingly, as to these forty-four Plaintiffs, a bench trial is set pursuant to 9 U.S.C. § 4 on **September 16, 2014, at 9:00 a.m.**, in courtroom 2-B of the Frank M. Johnson, Jr. U.S. Courthouse Complex, One Church Street, Montgomery, Alabama.  The § 4 bench trial will be limited to whether there is an Arbitration Agreement in writing, as required by 9 U.S.C. § 2, and whether under state law, these forty-four Plaintiffs gave mutual assent to binding arbitration, as discussed in Part V.B.1. and Part V.C.1. of this opinion.

The Clerk of the Court is DIRECTED to provide a court reporter for the bench trial.

DONE this 26th day of August, 2014.

/s/ W. Keith Watkins
CHIEF UNITED STATES DISTRICT JUDGE